# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **BRIAN COOK,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 10 C 6698** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | **Magistrate Judge Morton Denlow** |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

Claimant Brian Cook ("Claimant") brings this action under 42 U.S.C. § 405(g), seeking reversal or remand of the decision by Defendant Michael J. Astrue, Commissioner of Social Security ("Defendant" or "Commissioner"), denying Claimant's application for Disability Insurance Benefits ("DIB"). Claimant raises the following issues in his motion for summary judgment: (1) whether the ALJ properly analyzed the onset date of Claimant's disability; (2) whether the ALJ considered Claimant's impairments in combination; (3) whether the ALJ made a valid credibility determination; and (4) whether the ALJ properly found that Claimant could perform a significant number of jobs in the national economy. For the following reasons, the Court denies Claimant's motion for summary judgment and affirms the Commissioner's decision.

# I. BACKGROUND FACTS

## A.    Procedural History

Claimant initially filed for DIB on December 31, 2007, alleging a disability onset date of November 25, 2002.  R. 135–39.  Claimant's date last insured was December 31, 2004. R. 148.  The Social Security Administration ("SSA") denied his application on March 7, 2008.  R. 76–80.  Claimant then filed a request for reconsideration, which was denied on October 2, 2008.  R. 89–92.  Thereafter, Claimant requested a hearing before an ALJ.  R. 93.

On December 10, 2009, Administrative Law Judge Curt Marceille (the "ALJ") presided over a hearing at which Claimant appeared with his attorney, Christopher Bodeen. R. 37–71.  Claimant and Grace Gianforte, a vocational expert, testified at the hearing.  No medical expert testified.  On March 26, 2010, the ALJ rendered a decision finding that Claimant was not under a disability at any time from the alleged disability onset date through the date last insured.  R. 5–10.  Specifically, the ALJ found Claimant had "the residual functional capacity to perform sedentary work" with certain restrictions and that "[C]laimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy."  R. 11, 17.

Claimant then filed for a review of the ALJ's decision to the Appeals Council.  R. 122. On August 13, 2010, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  R. 1–4.  Claimant subsequently filed this action for review pursuant to 42 U.S.C. § 405(g).

## B.    Hearing Testimony—December 10, 2009

### 1.    Brian Cook—Claimant

At the time of the hearing, Claimant was 38 years old and living with his mother.  R. 41, 50.  Claimant graduated high school and worked most recently as a barber starting in 2000.  R. 42.  He earned $18,000 to $20,000 per year at that job.  It is unclear when exactly Claimant stopped working because he had no tax return copies and was unsure whether he filed a return every year.  R. 42–43.  He was working in August 2003 and stopped "[a]round summertime . . . or maybe like around November" of 2003.  R. 42–44.  He stopped working because of pneumonia, congestive heart failure, and "shortness of breath, headaches, fatigue, swelling of [his] legs, palpitations of the heart, chest pains, [and] gout."  R. 44.  Claimant has received Supplemental Security Income ("SSI") since December 11, 2007.  R. 40.

Claimant estimated he could walk a block before getting tired and short of breath and could only lift about eight pounds.  R. 46, 48.  He could stand for ten or fifteen minutes before needing to take a break or sit down and elevate his legs.  R. 46.  Claimant also elevated his legs when they were swollen, and so would prop his feet up on pillows and chairs.  R. 46–47, 54, 60.  He could sit for between fifteen and thirty minutes before he got "restless" and had to use the bathroom.  R. 46.  He took Lasix, a diuretic, which caused him frequent urination and occasional leg cramps.  R. 55.  He testified to using the restroom at least three to four times an hour.  R. 56.  When he stopped working he weighed about 330 pounds, was often drowsy, and would fall asleep during down time.  R. 54.

Claimant generally avoided leaving the house except to attend weekly religious services and monthly or bi-monthly health checkups.  R. 49, 61.  Despite having a driver's

license, he does not drive. R. 51. Claimant indicated that he did not go shopping, then admitted to visiting a store for toiletries a few months prior to the hearing, though he claimed this was the only time he has shopped in the last five years. R. 52. Claimant also stated that he does not clean the house, but occasionally cooks food. *Id*.

### 2. Grace Gianforte—Vocational Expert ("VE")

Grace Gianforte testified as a vocational expert. R. 62. Claimant's most recent position as a barber was skilled work. *Id*. While questioning the VE, the ALJ asked whether a person of Claimant's age, education, and past relevant work experience, limited to only sedentary work and unable to climb ramps or stairs, could perform Claimant's past relevant work. R. 63. The VE responded that none of Claimant's past relevant work was at the sedentary level, and therefore could not be performed by Claimant. *Id*. That said, the hypothetical person could perform the positions of information clerk, security monitor, and appointment clerk. *Id*. Information clerk is a semi-skilled job with about 4,000 positions available in the Chicago metropolitan area; appointment clerk is low-end semi-skilled with 3,000 positions; and security monitor is unskilled with 1,500 positions. R. 62–63. The jobs all involve a stress level of two or three on a scale of one to ten, one being minimal stress, ten being high stress. R. 66. Regarding the stress of the security monitor position, the position involves working alone, logging unusual events, and making a phone call if an emergency arises. *Id*. Next, when the ALJ added to his hypothetical the need to elevate a foot while seated, the VE indicated that availability of work would depend on the height of elevation. R. 64. Pillow or footstool level would be fine, but chair level would preclude

employment from the cited jobs. *Id*. Additionally, washroom breaks of three to four times an hour would be excessive and preclude work. R. 66.

## C.     Medical Evidence

### 1.     Claimant's Medical Treatment Before the Date Last Insured

Even before the alleged onset date in November 2002, Claimant was treated for heart problems that resulted in "severe" congestive heart failure ("CHF").[1] R. 226–31, 236–37, 248, 268. As of February 2002, Claimant's ejection fraction was 20–25%.[2] R. 251–52. Claimant's symptoms included shortness of breath, coughing, congestion, and swollen feet. R. 230. On November 14, 2002, just before the alleged onset date, Claimant was treated with medication, including a diuretic, and prescribed a low-salt, low cholesterol diet. R. 251, 253. Dr. Sanjeev Joshi appears to have been Claimant's primary care physician during this period. By the alleged onset date of November 25, Dr. Joshi reported that "[t]he CHF is better" and that Claimant "otherwise has been doing fair." R. 224. Chest x-rays revealed improved congestion after a bout of bronchitis. R. 224, 235.

In January 2003, Claimant visited Dr. Joshi feeling poorly and complaining of shortness of breath, cough, and congestion. R. 217. A chest x-ray showed a moderately to markedly enlarged heart, and "possible very early congestive changes." R. 220. Dr. Joshi

---

[1] CHF is heart failure in which the heart cannot maintain adequate circulation of blood. Merriam-Webster's Medical Dictionary (2007).

[2] Ejection fraction is the ratio of the volume of blood the heart empties during contraction to the volume of blood in the heart when expanded, expressed as a percentage. Merriam-Webster's Medical Dictionary (2007).

diagnosed Claimant with probable CHF and bronchitis, as well as sleep apnea and obesity R. 217.

Claimant reported intermittent symptoms throughout the rest of 2003, and his ejection fraction numbers rose through the rest of that year. In March 2003, Claimant had an ejection fraction of 35%. R. 265. On April 10, 2003, Claimant reported weekly chest throbbing, but no chest pain, shortness of breath, edema, or dizziness. R. 284. Two weeks later, Claimant reported feeling well, and had no chest pain, shortness of breath, palpitations, or edema. R. 281.

In July 2003, Claimant was admitted to the hospital with pneumonia, complaining of cough, congestion, fever, and chills. R. 395–96. Dr. Joshi noted that Claimant had "been doing well" and that he "had been working full-time too." R. 396. The pneumonia was treated with antibiotics, respiratory therapy, and cough medicine. R. 395. On August 18, 2003, Dr. Joshi noted at a checkup that Claimant seemed "a little tired," but "seems to be feeling much better now. He is back to work. Denies any shortness of breath except when it is very hot." R. 276. Claimant's ejection fraction had improved to 35–40%. R. 259.

Later in 2003, Claimant's condition showed marked improvement. Claimant's ejection fraction as of August 2003 was interpreted as 35–40% by a lab report and 40–45% by Dr. Joshi.[3] R. 259, 273. On November 17, 2003, Claimant saw Dr. Joshi for a cough, congestion, and sore throat, and a chest x-ray came back negative for CHF. R. 275.

---

[3] The ALJ mistakenly dated this ejection fraction reading in September rather than August 2003. R. 13.

Claimant's heart-related symptoms returned but then diminished again in 2004. On April 16, 2004, Claimant complained of shortness of breath and dry cough while seeing Dr. Joshi. R. 273. Chest x-rays once again indicated CHF, and Dr. Joshi noted that Claimant had failed to follow his dietary restrictions by "taking more than his share of salty products and drinking more fluids over the holidays." R. 233, 273. One month later, though, Claimant visited the doctor complaining of a headache but denied having shortness of breath, chest pain, or palpitations. R. 272. In October 2004, Claimant visited Dr. Joshi reporting headache, dizziness, chills, and a sore throat, and he received antibiotics. R. 269. At a cardiology visit one month later, the month before he lost insured status, Claimant reported no heart-related symptoms at all. Specifically, he denied having chest pain, shortness of breath, dizziness, or palpitations. R. 267. This November 2004 visit was the last time Claimant visited a doctor for his heart condition until August 2006. R. 244–45, 267.

## 2. Claimant's Medical Treatment After the Date Last Insured

Claimant received treatment for several other medical problems in the time after December 31, 2004, his date last insured. In February 2005, Claimant saw Dr. Joshi for a blood pressure re-check, and had a cough and big toe pain. R. 266, 301. In November 2005, Claimant saw his doctor for toe pain, which the doctor believed to be a mild fungal infection, potentially gout. R. 263. In July 2006, Claimant saw Dr. Joshi for a checkup and refill of medications. R. 261. He noted that Claimant was tired and "probably [had] sleep apnea," and had a history of gout. R. 260. Dr. Joshi also noted that Claimant had gained "a lot of weight" and advised him to exercise and lose weight. *Id.* In September 2006, Claimant was

referred to a sleep lab for sleep apnea. R. 308. The study revealed severe obstructive sleep apnea, and Claimant was advised to lose weight and have additional tests performed. R. 309. A few days later, Dr. Joshi noted that Claimant "was recently diagnosed to have early type 2 diabetes," and recommended a diet. R. 255.

Eventually, Claimant's heart condition worsened again. In August 2006, Claimant's ejection fraction had fallen back to 20–25%. R. 244–45. From 2007 to 2009, Claimant continued to receive treatment for CHF exacerbation. Claimant had a defibrillator implanted in December 2007, the same month he began receiving SSI benefits. R. 40, 321–22.

### 3.  Doctor Questionnaire—Dr. Carl Leigh

On January 12, 2010, Dr. Carl Leigh completed a medical interrogatory of physical impairments and a medical source statement of ability to do work-related activities from Claimant's alleged disability onset date of November 25, 2002 to the date last insured of December 31, 2004. R. 536–38, 540–45. Dr. Leigh noted that Claimant's impairments during this period were hypertension, near morbid obesity, and CHF secondary to nonischemic cardiomyopathy, but he found that the impairments did not meet or equal any impairment described in the SSA's Listing of Impairments. R. 537. Dr. Leigh indicated that although Claimant's ejection fraction was 25% in February 2003, it improved to 35% the following month and in August 2003, it had improved to 40–45%. *Id.* He also noted that the diagnoses of sleep apnea, diabetes and gout were established after the date last insured. R. 536. Dr. Leigh opined that Claimant could lift and carry up to ten pounds occasionally and less than ten pounds frequently; could sit six hours without interruption and six hours

8

total in an eight-hour work day; could stand or walk two hours without interruption and four hours total in an eight-hour work day; and could occasionally climb stairs and ramps, stoop, kneel, crouch, and crawl, but never climb ladders or scaffolds. R. 540–41, 543.

### 4.    RFC Questionnaire—Dr. Abed Dehnee

On February 12, 2009, Dr. Abed Dehnee[4] completed a Cardiac RFC questionnaire for Claimant, analyzing Claimant's symptoms and limitations only from that day forward. R. 516–21. Dr. Dehnee had been Claimant's doctor for over one year and saw Claimant every three to five months. R. 517. He noted that Claimant had a history of admissions due to CHF. *Id.* He diagnosed Claimant with cardiomyopathy of Class I to II under the New York Heart Association standards, meaning a heart condition that caused no or only slight limitation on physical activity. *Id.* Dr. Dehnee reported that Claimant had shortness of breath, fatigue, weakness, palpitations, and dizziness, but did not have chest pain, anginal equivalent pain, edema, nausea, or sweatiness. *Id.* He reported that Claimant did not have marked limitation of physical activity. *Id.* Dr. Dehnee opined that Claimant was capable of low stress jobs, that Claimant's physical symptoms and limitations cause emotional difficulties, and that Claimant occasionally experienced symptoms severe enough to interfere with attention and concentration. R. 518. Dr. Dehnee asserted that Claimant could walk two city blocks without rest or severe pain, and that he could stand or walk for less than two hours and sit for about four hours in an eight-hour work day. R. 519. He stated that

---

[4] The ALJ mistakenly referred to Dr. Dehnee as "Dr. Dahnee." R. 14

Claimant would need to take two to three unscheduled breaks, but also opined that Claimant did not need to elevate his legs. *Id.* Dr. Dehnee also noted that Claimant would miss more than four days of work per month. R. 521.

**D.      The ALJ's Decision—March 26, 2010**

On March 26, 2010, the ALJ issued his decision finding that Claimant was not under a disability at any time from the alleged disability onset date to the date last insured. R. 17. The ALJ evaluated Claimant's application under the required five-step sequential analysis. R. 10–17. At step one, the ALJ found that Claimant did not engage in substantial gainful activity. R. 10. That said, the ALJ noted evidence suggesting that Claimant worked at least until August 2003, which, "strongly suggest[ed] that he was not disabled or at the very least, not as limited as he has alleged." *Id.* At steps two and three, the ALJ found that Claimant had the severe impairments of CHF, cardiomegaly (heart enlargement), obesity, left ventricular dysfunction with a significantly reduced ejection fraction, gout, and sleep apnea, but that these impairments, both individually and in combination, did not meet or equal a listed impairment. R. 10–11. Regarding CHF, the ALJ agreed with Dr. Leigh's uncontradicted opinion that Claimant's heart condition did not meet or equal Listing 4.02 because it was not severe enough for twelve consecutive months during the relevant period. R. 11.

As for the residual functional capacity ("RFC")[5] finding necessary before proceeding

---

[5]A residual functional capacity assessment is the most that a person can do despite their physical and mental limitations. The Social Security Administration assess a person's residual

to step four, the ALJ determined that Claimant had "the [RFC] to perform sedentary work as defined in 20 CFR 404.1567(a) except the claimant should not perform any climbing of ladders, ropes, scaffolds, ramps or stairs." *Id*. The ALJ found that Claimant's impairments could reasonably be expected to produce his symptoms, but that Claimant's statements concerning the intensity, persistence and limiting effects of those symptoms were not credible to the extent they contradicted the RFC finding. R. 12. The ALJ highlighted that Claimant reported feeling well in March 2003, which corresponded with his improving ejection fraction numbers. R. 13. The ALJ also traced a decrease in reported coronary symptoms throughout 2003, including Claimant's report in August that he was working. *Id*. In sum, Claimant "did report shortness of breath, dizziness, and other problems on occasions," but the record revealed that on many occasions Claimant "expressly denied complaints of chest pain, shortness of breath, palpitation, dizziness or swelling." *Id*. The ALJ also found "virtually no record support" for Claimant's frequent urination claim. R. 14. In regards to sleep apnea, the ALJ noted that the evidence prior to the date last insured contained "scant support for [C]laimant's allegations that he was always tired, or that he fell asleep at inappropriate times." *Id*. Regarding obesity, the ALJ found no indication in the record that Claimant's obesity caused greater restrictions than the RFC finding. R. 15. Additionally, the ALJ found that Dr. Dehnee's 2009 cardiac RFC questionnaire undermined much of Claimant's testimony because the report concluded that Claimant was much less

functional capacity based on all of the relevant evidence in his or her case record. 20 § 404.1545(a).

limited than he alleged at the hearing.  R. 14.  The ALJ found that Claimant's inactivity was "a personal choice rather than due to his physical condition."  R. 15.  The ALJ gave particular weight to the conflict between Claimant's alleged onset date and his admitted full-time employment during 2003.  R. 16.

At step four, the ALJ found Claimant unable to perform any past relevant work.  *Id*. At step five, the ALJ found that there were jobs that existed in significant numbers in the national economy that Claimant could have performed.  *Id*.  Thus, the ALJ concluded Claimant was not under a disability at any time from the alleged disability onset date through the date last insured.  R. 17.

## II.  LEGAL STANDARDS

### A.  Standard of Review

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an ALJ becomes the Commission's final decision if the Appeals Council denies a request for review. *Sims v. Apfel*, 530 U.S. 103, 106–07 (2000).  Under such circumstances, the district court reviews the decision of the ALJ.  *Id.*  The reviewing court may enter judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  A "mere scintilla" of evidence is not enough.  *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.

2002).  Even when the record contains adequate evidence to support the decision, the findings will not be upheld if the ALJ does not "build an accurate and logical bridge from the evidence to the conclusion."  *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008).  If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Villano v.  Astrue*, 556 F.3d 558, 562 (7th Cir. 2009).

Though the standard of review is deferential, a reviewing court must "conduct a critical review of the evidence" before affirming the Commissioner's decision.  *Eichstadt v. Astrue*, 534 F.3d 663, 665 (7th Cir. 2008).  It may not, however, "displace the ALJ's judgment by reconsidering facts or evidence, or by making independent credibility determinations."  *Elder v.  Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports the findings.  *Nelms v. Astrue*, 553 F.3d 1093, 1097 (7th Cir. 2009).

## B.    Disability Standard

Disability insurance benefits are available to a claimant who can establish he is under a "disability" as defined by the Social Security Act.  *Liskowitz v. Astrue*, 559 F.3d 736, 739–40 (7th Cir. 2009).  "Disability" means an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  An individual is under a disability if he is unable to perform his previous work and cannot, considering his age, education, and work experience, partake in any gainful employment that exists in the national economy.  42 U.S.C. § 423(d)(2)(A).  Gainful employment is defined as "the kind of work usually done for pay or profit, whether or not a profit is realized."  20 C.F.R. § 404.1572(b).

A five-step sequential analysis is utilized in evaluating whether a claimant is disabled. 20 C.F.R. § 404.1520(a)(4)(i–v).  The ALJ must inquire, in the following order: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing other work.  *Id.*  Once the claimant has proven he cannot continue his past relevant work due to physical limitations, the ALJ carries the burden to show that other jobs exist in the economy that the claimant can perform.  *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

## III.  DISCUSSION

Substantial evidence supported the ALJ's decision in this case. Over the roughly two-year period at issue, Claimant's heart condition improved to the point that Claimant's heart-related symptoms disappeared just before his date last insured. The Commissioner produced opinion evidence that Claimant could perform at least sedentary work during this period, and Claimant has produced no medical opinions to the contrary. Most tellingly, Claimant admitted at his hearing that he worked full-time through almost half of the alleged disability period, thus seriously undercutting his claims of disability.

Claimant nevertheless argues that the ALJ committed several reversible errors, and he raises the following issues in support of his motion: (1) whether the ALJ properly analyzed the onset date of Claimant's disability; (2) whether the ALJ considered Claimant's impairments in combination; (3) whether the ALJ made a valid credibility determination; and (4) whether the ALJ properly found that Claimant could perform a significant number of jobs in the national economy. The Court addresses each in turn.

## A.     The ALJ Properly Analyzed Claimant's Alleged Disability Onset Date.

Claimant argues that the ALJ erred by failing to abide by the requirements of SSR 83-20 when determining Claimant's disability onset date. SSR 83-20 comes into play when an ALJ determines a claimant is disabled as of the application date but the question arises whether the claimant was disabled at an earlier date. *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004). When this question arises, the ALJ must consider a claimant's allegations, work history, and medical evidence as factors to determine the onset date. SSR 83-20, 1983 WL 31249, at *1. If the medical evidence does not reveal the precise date that an impairment

became disabling, the ALJ must infer the onset date from the medical and other evidence and should seek the help of a medical expert to make this inference. *Id.* at *2.

The parties here dispute whether SSR 83-20 was triggered by Claimant's receipt of SSI or by the ALJ's statement that Dr. Dehnees's report "supports a finding of disability since February 2009." R. 15. But the ALJ validly analyzed the onset date, whether SSR 83-20 was technically triggered or not. The ALJ did not explicitly invoke SSR 83-20, but this omission by itself was not reversible error so long as the ALJ conducted a proper analysis. *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Claimant argues that the ALJ's reliance on Dr. Leigh's opinion was improper because Dr. Leigh only considered evidence before the date last insured, but Claimant is mistaken. While Dr. Leigh's conclusions focused on Claimant's limitations before the date last insured, there are indications that he reviewed the entire record in reaching his conclusions—Dr. Leigh's report referred to 2008 RFC assessments and diagnoses established after the date last insured. R. 15. Just because Dr. Leigh did not explicitly invoke post-2004 test results does not mean that he failed to review them, especially given the existence and presumably greater relevance of objective medical evidence from the period in question.

Beyond Dr. Leigh's opinions, the ALJ thoroughly examined Claimant's allegations, work history, and the other medical evidence, as required by SSR 83-20. Most importantly, the ALJ placed great weight on Claimant's admission that he worked five days per week as a barber through at least August of 2003, earning approximately $20,000 per year. R. 10, 16. As the ALJ noted, "claimant's work activity strongly suggest[s] that he was not disabled or

at the very least, not as limited as he alleged." R. 10. The ALJ also traced Claimant's reports of symptoms though the relevant period, painting a picture of a heart condition that improved over the alleged disability period, to the point that Claimant denied having any heart-related symptoms just a month before his insured status expired. R. 12–13. As a whole, the ALJ's decision was clearly focused on determining whether Claimant's disability onset occurred before or after the date last insured, and the ALJ considered all the evidence required by SSR 83-20.

**B.     The ALJ Adequately Considered Claimant's Combined Impairments.**

Claimant next argues that the ALJ did not consider Claimant's obesity, sleep apnea, and gout in combination with his other impairments. Much of the argument focuses on Claimant's obesity. While there is no listing for obesity, Claimant may establish a listing-level impairment if he had an impairment that, in combination with obesity, equaled the requirements of a listing. SSR 02-1p, 2000 WL 628049, at *5 (Sept. 12, 2002). Even where an ALJ's decision does not explicitly analyze obesity, the omission may be harmless if the ALJ relied on the opinions of doctors who were aware of the obesity. *Prochaska v. Barnhart*, 454 F.3d 731, 736–37 (7th Cir. 2006). When appealing an ALJ's decision, Claimant must articulate how his obesity limits his functioning and exacerbates his impairments. *See id.*

Here, the ALJ adequately accounted for Claimant's obesity. Claimant argues that the ALJ should have considered at step two whether Claimant's obesity could substitute for a requirement of Listing 4.02 for chronic heart failure. But that listing requires an objectively-

defined heart failure in addition to functional limitations. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Claimant's medical evidence could not even meet the first prong of Listing 4.02; as Dr. Leigh discussed, Claimant's ejection fraction did not remain at or below the listing level of 30% for the required twelve consecutive months. R. 537. Claimant insists that Dr. Leigh should have also discussed Claimant's listing-level readings from 2006, but he omits any plausible explanation of how those readings could have trumped evidence from the period at issue. Without meeting the first prong of Listing 4.02, any limitations caused by Claimant's obesity are irrelevant.

As for the RFC discussion, the ALJ relied on evidence that incorporated the effects of Claimant's obesity. For instance, the opinion evidence came from doctors who took into account Claimant's obesity. Likewise, the ALJ extensively reviewed Claimant's reported symptoms and his daily activities, which by their nature reflect the combined impact of all Claimant's impairments, including obesity. Finally, the ALJ explicitly stated that he found no indication in the record that Claimant's obesity caused greater restrictions than the RFC finding. R. 15.

Claimant's allegations regarding sleep apnea and gout are equally unpersuasive. Regarding sleep apnea, the ALJ went into detail discussing the alleged impairment, including Claimant's 2006 sleep study, which was after the date last insured. R. 14. As for Claimant's testimony that he would fall asleep at inappropriate times, the ALJ correctly noted that the record contained scant evidence that Claimant complained of chronic sleepiness before his date last insured. *Id.* Regarding gout, Claimant fails to cite any evidence from before his

date last insured of gout, foot pain, or other joint pain.

## C.    The ALJ Adequately Evaluated Claimant's Credibility.

When faced with a claimant alleging subjective symptoms such as pain, an ALJ evaluates the credibility of testimony relating to the intensity, persistence, and effects of those symptoms. *See* 20 C.F.R. 404.1529(c). The ALJ considers the testimony in light of the entire record and must justify the credibility finding with specific reasons. *Villano*, 556 F.3d at 562. The ALJ must consider several factors, including the individual's daily activities, the location, frequency, and duration of the symptoms, aggravating factors, medication and its effects, and other treatment. SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). Since the ALJ is in the best position to determine the credibility of witnesses, his credibility finding is given "considerable deference" and will be overturned only if it was "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

Here, the ALJ concluded that Claimant's impairments could reasonably be expected to cause the alleged symptoms, but that the "statements concerning the intensity, persistence and limiting effects of these symptoms are not fully credible to the extent they are inconsistent with the [RFC] assessment." R. 12. Claimant puts forth a laundry list of alleged errors in the credibility analysis.

Claimant first argues that the ALJ improperly drew an inference from Claimant's lack of heart-related medical visits from November 2004 to August 2006. Infrequent treatment can support an adverse credibility finding if a claimant has no good explanation for the lack of treatment. SSR 96–7p, 1996 WL 374186, at *7. Even so, the ALJ "must not draw any

inferences" from the gap in treatment until he has explored "any explanations that the individual may provide, or other medical information in the case record" that may explain the infrequent or irregular visits. *Id*. Claimant complains that the ALJ should have given him a chance to explain the gap in treatment, but Claimant puts forth no plausible alternate explanation for the gap, given Claimant's manifest ability to procure treatment when experiencing a medical problem. In fact, Claimant continued to receive treatment for other more minor conditions throughout the period in question. When viewed in combination with Claimant's lack of symptoms by the end of 2004, the gap in treatment strongly suggests that Claimant's condition had improved. The ALJ was not required to address hypothetical alternate explanations without support in the record.

Claimant additionally contests the ALJ's discounting of Claimant's alleged frequent urination caused by his diuretic medication. The ALJ must consider the "type, dosage, effectiveness, and side effects of any medication the individual takes or has taken." SSR 96–7p, 1996 WL 374186, at *3. That said, the ALJ may discount testimony regarding side effects of medication that are unsubstantiated by objective evidence. *See Nelson v. Secretary of Health & Human Servs.*, 770 F.2d 682, 685 (7th Cir. 1985). Claimant relies on dicta in which the Seventh Circuit stated, "[W]e are skeptical that a claimant's failure to identify side effects undermines [his] credibility—after all, not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects." *Terry v. Astrue* 580 F.3d 471, 477 (7th Cir. 2009). In *Terry*, however, the only side effect mentioned was drowsiness. *Id.* Here, where Claimant alleged

that his medication made him urinate at the extraordinary rate of three to four times per hour, it was reasonable to expect that Claimant's hospital charts or checkup notes would note the problem at least once. The ALJ correctly observed the lack of record support for urinary frequency, reasonably inferring that the condition was not as severe as Claimant indicated.

Claimant additionally alleges that the ALJ treated Dr. Dehnee's report inconsistently, by using the report to discount Claimant's testimony and yet not adopting the report's limitations. What Claimant ignores is that the ALJ used Dr. Dehnee's report as credibility evidence rather than direct evidence of Claimant's condition in 2004. The report dealt with a period long after the date last insured, but it was also close in time to the hearing, so inconsistencies between Claimant's testimony and the report remained relevant. Claimant also notes, correctly, that the ALJ mistated which symptoms Dr. Dehnee listed in his report, but that did not affect the ALJ's use of the report, because the ALJ correctly summarized the conclusions that contradicted Claimant's testimony. Ultimately, the point was that even in 2009, after Claimant's impairments had worsened, "the claimant's own treating physician did not indicate that claimant was nearly as limited as the claimant alleged." R. 14.

Finally, Claimant attacks the ALJ's discussion of the medical evidence, which the ALJ found inconsistent with Claimant's alleged limitations. For instance, Claimant contends that the ALJ should have recognized that Claimant's July 2003 symptoms of cough, congestion, chills, and fever were related to his heart impairment, citing an article to this effect from ehow.com. Whether or not the illness was linked to Claimant's heart condition, the medical records merely reflect a diagnosis of pneumonia that improved with antibiotics

and cough medicine, and the ALJ appears to have done no more than recount the episode in his decision.  R. 395–96.  Claimant also complains that the ALJ rejected his alleged need to elevate his legs.  Claimant correctly notes that the ALJ must consider any measures other than treatment the individual uses or has used to relieve pain or other symptoms.  SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996).  The ALJ explicitly considered this in his opinion.  R. 14.  He also noted that no doctor told Claimant to elevate his legs, while Dr. Dehnee expressly asserted that Claimant did *not* need to elevate his legs.  R. 519.  Claimant also repeats several arguments already addressed in other sections above, which the Court will not repeat here.  Claimant's attempt to nitpick the ALJ's discussion of the medical evidence is unpersuasive.

**D.    The ALJ Properly Found that Claimant Could Have Worked as a Security Monitor.**

Claimant argues that none of the three positions identified at step five were appropriate jobs for Claimant.  At step five, the burden shifts to the Commissioner to prove that a significant number of jobs are available in the national economy for an employee with the claimant's ability. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).  First, Claimant argues that the ALJ erred in finding that Claimant could perform the semi-skilled jobs of "information clerk" and "appointment clerk," because the ALJ did not find that Claimant had skills transferable to those positions.  Social Security regulations direct a finding of unskilled work history unless a claimant can use his acquired skills in other skilled or semi-skilled work. 20 C.F.R. § 404.1565.  Given Claimant's presumed unskilled work history, the ALJ erred in finding that Claimant could perform semi-skilled work.

Despite this mistake, the unskilled job of security monitor remains, for which 1,500 jobs exist in the regional economy.  R. 17.  Claimant questions whether 1,500 jobs are enough, but the Seventh Circuit has recently indicated that "[a]s few as 174 jobs has been held to be significant, and it appears to be well-established that 1,000 jobs is a significant number." *Liskowitz,* 559 F.3d at 743 (collecting cases); *see also Lee v. Sullivan*, 988 F.2d 789, 794 (7th Cir. 1993) (affirming ALJ's finding that 1,400 jobs was a significant number).  Claimant maintains that the question of "significant numbers" is an individualized finding left to the ALJ, but the Court will not remand simply for the ALJ to state the obvious.

Claimant also raises supposed conflicts between his limitations and the requirements

of the security monitor job. Claimant attempts to frame this issue as an "unresolved potential conflict" with the Dictionary of Occupational Titles. *See Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006). The ALJ has a duty to inquire into a potential conflict with the DOT only if the conflict was apparent, that is, "obvious enough that the ALJ should have picked up on [it] without any assistance." *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (alteration in original).

First, Claimant argues that he was incapable of the stress required by the security monitor position, but this argument fails both because the position was low-stress and because Claimant's RFC contained no stress limitation. The VE directly addressed the position's stress level, testifying that security monitor ranked only a two or three on a scale of one to ten, one being minimal stress. R. 66. The VE also noted that the position involved working alone, logging unusual activity, and making a phone call if an emergency arises. *Id*. This job description does not suggest a high stress level. Moreover, Claimant uses Dr. Dehnee's opinion, rather than the RFC finding, as the basis for arguing that Claimant was capable of only low-stress jobs. R. 521. Dr. Dehnee's opinion only applied from 2009 forward, so the ALJ did not adopt its proposed limitations. The question is not whether Claimant can perform the job now, but whether he could have performed it before his disability insurance benefits expired in 2004. Lastly, Claimant asserts that his sleep apnea may have left him too drowsy to sit and observe television monitors, but this supposed inconsistency is speculative, not apparent. Besides, the ALJ correctly noted that the record lacked evidence of Claimant falling asleep at inappropriate times, notwithstanding

Claimant's discredited hearing testimony. R. 14. The ALJ validly found that Claimant could have worked as a security monitor, a job that exists in significant numbers in the national economy.

## IV. CONCLUSION

For the reasons set forth in this opinion, the Court denies Claimant's motion for summary judgment and affirms the Commissioner's decision.

**SO ORDERED THIS 12th DAY OF JULY, 2011.**

_____
**MORTON DENLOW
UNITED STATES MAGISTRATE JUDGE**

**Copies sent to:**

Barry Schultz
The Law Offices of Barry A. Schultz, P.C.
1601 Sherman Avenue
Suite 510
Evanston, IL 60201

Counsel for Plaintiff

Anne Kenny Kleinman
Assistant Regional Counsel
200 W. Adams St.
30th Floor
Chicago, IL 60606

Donald R. Lorenzen
United States Attorney's Office
219 S. Dearborn St.
Chicago, IL 60604

Counsel for Defendant